IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAIN STREET BUSINESS FUNDING, LLC; AND ROBERT S. GOGGIN, III, <br><br> Plaintiffs, <br> v. <br><br> MICHAEL J. GOLDNER; JDJSL LLC; DOVECOTE LANE, LLC; JOEL S. LUBER; AND REGER RIZZO & DARNELL LLP. <br><br> Defendants. | Case No. 2:19-cv-03522-CDJ <br><br> (Removed from the Court of Common Pleas, Philadelphia County, Case No. 16-05-02449) |

**OMNIBUS ADDITIONAL MATERIAL FACTS IN OPPOSITION
TO THE TWO MOTIONS FOR SUMMARY JUDGMENT BY EACH OF
DEFENDANT JOEL S. LUBER AND DEFENDANT REGER RIZZO & DARNELL, LLP**

Plaintiff Main Street Business Funding, LLC submits the following additional material facts in opposition to the two motions for summary judgment by each of Defendant Joel S. Luber and Defendant Reger Rizzo & Darnell, LLP.[1]

1.      Sometime in 2013, plaintiff Robert S. Goggin ("Goggin") was inspired by the success of an investment he had made in a company called CBSG, which was run in part by Michael Goldner ("Goldner") (EX. 1 -- Robert Goggin Depo Tr. 37:25 – 38:3).

2.      Accordingly, plaintiff Robert Goggin formed plaintiff Main Street Business Funding ("Main Street")  (EX. 1 -- Robert Goggin Depo Tr. 33:15-20), a Delaware Limited Liability Company (EX. 6 -- Robert Goggin Ex. D-2) which he solely owned and controlled, either directly or through a trust, right up until its bankruptcy in 2019.  EX. 1 -- Robert Goggin Depo Tr. 86:22 – 87:5.

3.      Like CBSG, the business of Main Street was to be a "business to business cash advance company" (EX. 1 -- Robert Goggin Depo Tr. 32:25 – 33:1).

---

[1]      Plaintiff Robert S. Goggin, III joins in this statement and in all oppositions and arguments.

4.      Even as he founded it, Robert Goggin acknowledged that he was "absolutely not" capable of either beginning it or running it on his own  (EX. 1 -- Robert Goggin Depo Tr. 30:21-31:8).

5.      However, the decision to initiate the business was made regardless of who else would help run it.  EX. 1 -- Robert Goggin Depo Tr. 90:8-22.

6.      By February 2014, Main Street was in business, albeit not fully operational, and Robert Goggin, who did not have experience running a factoring company, needed someone knowledgeable to run the business, and was considering more than one person for that job.  EX. 1 -- Robert Goggin Depo Tr. 203:15-22; 205:4-16.

7.      In early 2014, Robert Goggin was still trying to figure out how to structure the operations of Main Street, and Goldner suggested that he visit "someone who knows what they're doing" – namely, Joel Luber.  EX. 1 -- Robert Goggin Depo Tr. 91:4-8.

8.      Sometime thereafter, Luber called Robert Goggin (rather than the other way around).  EX. 1 -- Robert Goggin Depo Tr. 175:12 – 176:11.

9.      Joel S. Luber, Esquire ("Luber") is and was a partner attorney at the law firm of Reger Rizzo & Darnell, LLP ("Reger Rizzo").  EX. 2 -- Reger Rizzo Dep. 19:3 – 9.

10.      Reger Rizzo is a "general practice firm" of "46 attorneys" with a "pretty broad range of practice areas."  EX. 2 -- Reger Rizzo Dep. 16:10 – 17:10.

11.      In his work there as a partner, Luber is compensated through a guaranteed draw, with bonuses based on performance.  EX. 2 -- Reger Rizzo Dep. Tr. 19:7 – 20:2.

12.      Since early 2014, Luber has been the chair of the firm's trusts and estates department (EX. 2 -- Reger Rizzo Dep. Tr. 20:13 – 17), which department has about eight attorneys

(EX. 2 -- Reger Rizzo Dep. Tr. 20:18 – 21:3), of which Mr. Luber himself managed and still manages six.  EX. 2 -- Reger Rizzo Dep. Tr. 22:16 – 23:1.

13.     In his capacity as chair of the trusts/estates department, among other duties, Mr. Luber is charged with discussing "business development strategies for the department and the like."  EX. 2 -- Reger Rizzo Depo. Tr. 23:2 – 13.

14.     Reger Rizzo's policy is that a partner practicing law with Reger Rizzo is "required to practice it within the firm."  EX. 2 -- Reger Rizzo Depo Tr. 56:3-57:5.

15.     Outside business interests are tolerated with "the expectation . . . that each partner is to devote his full effort, energy and attention to the firm practice.  So to the extent any outside business interest would impede or impair that, that would be something that would need to be discussed."  EX. 2 -- Reger Rizzo Depo Tr. 57:10 – 58:5.

16.     Accordingly, on or around February 2014, Robert Goggin attended a meeting in Luber's office at Reger Rizzo at the Cira Centre in Philadelphia.  EX. 1 -- Robert Goggin Depo Tr. 196:9 – 15.

17.     He went seeking legal advice.  EX. 1 -- Robert Goggin Depo Tr. 183:4 – 184:7.

18.     When Robert Goggin got to Luber's office, Goldner was there (uninvited) and participated in the meeting.  EX. 1 -- Robert Goggin Depo Tr. 197:1 – 16.

19.     It wasn't for another month to six weeks that Robert Goggin learned that Goldner and Luber were cousins.  EX. 1 -- Robert Goggin Depo Tr. 189:21 – 190:5.

20.     At the time of the initial meeting, Goldner owed Luber $75,000.  EX. 4 -- Luber Depo Tr. 26:13 – 19.

21.     During that first meeting, Luber advised Robert Goggin that Luber was the manager of the Goldner Family Trust for Goldner, and that a similar structure could be set up for Robert Goggin to insulate Robert Goggin and Main Street.  EX. 3 -- Goldner Depo Tr. 42:4 – 43:5.

22.     Luber also said that Goldner was completely capable of running the operations at Main Street.  EX. 1 -- Robert Goggin Depo Tr. 208:11 – 19.

23.     However, Luber advised that Goldner was the subject of civil suits as a result of a failed REIT, "Arcadia," that Goldner had managed during the financial crisis and collapse of 2008. Ex. 3 -- Goldner Depo. Tr. 42:4 – 43:5; EX. 1 -- Robert Goggin Depo Tr. 206:22-207:7; 226:7-228:6.

24.     Luber suggested that Robert Goggin could hire Goldner through an entity that would be managed by Luber.  EX. 1 -- Robert Goggin Depo Tr. 207:12-16; 208:1-10.

25.     This entity, JDJSL, would protect and insulate Robert Goggin and Main Street from any lawsuits and judgments Goldner was facing.  EX. 1 -- Robert Goggin Depo Tr. 207:17-24; 228:14 – 229:14.

26.     At that meeting with Luber, Robert Goggin decided that Goldner would run Main Street.  EX. 1 -- Robert Goggin Depo Tr. 205:17 – 24.

27.     Luber bragged to Robert Goggin about the suite of services that Reger Rizzo could offer Robert Goggin and Main Street, stating, "Within my wingspan in this building there's expertise in every aspect that you may need at Main Street, and I can access that information at my fingertips and get back to you immediately upon finding out the answers to your questions." EX. 1 -- Robert Goggin Depo Tr. 208:24-209:5.

28.     Luber was thus touting a key selling point for Reger Rizzo.  Reger Rizzo is a "general practice firm" and offers a "pretty broad range of practice areas."  EX. 2 -- Reger Rizzo Depo Tr. 16:10 – 17:10.

29.     Reger Rizzo boasts that "there is good collaboration among the practitioners in both [business services and trust and estates] departments" because of "the nature of their practices and the frequent overlap."  EX. 2 -- Reger Rizzo Dep. Tr. 20:18 – 21:11.

30.     In keeping with Reger Rizzo's philosophy and practice of cross-pollinization, Luber explained to Robert Goggin, "we're kind of a one-stop shop for everything you may need." EX. 1 -- Robert Goggin Depo Tr. 195:13-17.

31.     Luber stated that, if hired, he could run aspects of the business to assure protections were in place; could keep Robert Goggin apprised of changes in the law; and could draft documents to structure the entire operation, including undertaking to prepare the documents for a transfer of ownership to a new trust, viz. the Robert Goggin Family Trust.  EX. 1 -- Robert Goggin Depo. Tr. 209:5-16; 507:13-18.

32.     Robert Goggin did not have much understanding of the concept of the trusts being proposed by Luber; accordingly, Luber persuaded Robert Goggin to hire Luber to serve as his personal attorney for his soon-to-be-formed Trust, as well as Main Street's corporate attorney. EX. 1 -- Robert Goggin Depo Tr. 173:13 – 23.

33.     Indeed, at the meeting, Luber stated that, pursuant to the structure he was contemplating and that he recommended, Luber could manage all aspects of the business: "I can be your - - you know, your general counsel, and I can watch what is going on and you can have a very simple relationship in that regard, and instead of Michael being on top of things, I'll be on top

of things, and Michael will *be* responsive to me." EX. 1 -- Robert Goggin Depo Tr. 224:24 – 225:13.

34.     It was Robert Goggin's understanding that that Main Street's corporate counsel, Joel Luber, would control the ability to make cash distributions.  EX. 1 -- Robert Goggin Depo Tr. 158:19 – 159:6; 159:17-23.

35.     The concept of having an experienced corporate attorney assuring that everything was above-board and well controlled was appealing to Robert Goggin, and Robert Goggin agreed that Luber should be the corporate attorney for Main Street.  EX. 1 -- Robert Goggin Depo Tr. 225:14 – 225:17.

36.     With respect to performing legal services for Goldner, Luber informed Robert Goggin at the meeting that neither he nor his firm had represented Goldner for some time.  EX. 1 -- Robert Goggin Depo Tr. 218:13 – 219:10; 516:8 - 13.

37.     At no time during that meeting did Luber disclose that this "management" and "supervision" of Goldner, purportedly on behalf of Main Street, would actually result in him enjoying 10% of monies that flowed through JDJSL per his ownership of same, over and above any legal fees he charged Main Street for his services, and Robert Goggin remained ignorant of that fact until 2016.  EX. 1 -- Robert Goggin Depo Tr. 287:5 – 287:20.

38.     In addition to his undisclosed 10% ownership, Luber also received a management fee of 6% of revenues from JDJSL and regular car lease payments.  EX. 4 -- Luber Depo Tr. 44:2 – 44:22; Luber Depo Tr. 42:16 – 24.

39.     When Robert Goggin received the first draft of Reger Rizzo's engagement letter, Robert Goggin wanted it confirmed that Luber would be the person to respond if Robert Goggin

or Main Street needed to move quickly on an issue. EX. 1 -- Robert Goggin Depo Tr. 215:15 –
217:3.

40.    When inquiring, Robert Goggin said to Luber: "the myriad of things that may
come up down the line, am I to expect that every time something comes up I am going to get a
new engagement letter? If I call up about a collection matter, a guy went into bankruptcy or what
have you?" EX. 1 -- Robert Goggin Depo Tr. 215:15 – 217:3.

41.    Luber responded by stating that "we" (referring to himself and Reger Rizzo) will
handle all of that. EX. 1 -- Robert Goggin Depo Tr. 215:15 – 217:3.

42.    When Robert Goggin expressed concern by stating "I don't see anything in this
draft that reads that way," Luber replied "I'll take care of that." EX. 1 -- Robert Goggin Depo Tr.
215:15 – 217:3.

43.    The engagement letter draft was thereafter modified to read: "Pursuant to our
conference in our office on February 12, 2014 along with Mr. Goldner, for the purpose of
engaging my firm's services in connection with general representation matters associated with
Main Street Business Funding." EX. 7 -- Robert Goggin Depo. Ex. 4.  *See also* EX. 3 -- Goldner
Tr. 45:15 – 46:9.

44.    As such, in Robert Goggin's view, Luber and Reger Rizzo became Main Street's
true, enduring corporate counsel.  Robert Goggin also considered the Robert Goggin Family
Trust and holding the ownership of Main Street to be part of the corporate structure on which
Luber had advised Robert Goggin and Main Street.  EX. 1 -- Robert Goggin Depo Tr. 220:10 -
23;  222:11-23.

45.    This is why, when he received an initial draft of the engagement letter regarding the Robert Goggin Family Trust, Robert Goggin noted "it does not say anything in this document about the trust." EX. 1 -- Robert Goggin Depo Tr. 220:10 -23; 222:11-23.

46.    Per Luber's concept and recommended structure to protect Main Street and Robert Goggin, and also insulate them from Goldner's creditors (EX. 1 -- Robert Goggin Depo Tr. 207:17-24; 228:14 – 229:14), Luber informed Robert Goggin that he would be setting up an entity called JDJSL, LLC ("JDJSL"), which would be the entity through which Goldner would operate and manage the affairs of Main Street via a Consulting Agreement that Luber would be drafting, and that Michael Goldner would own JDJSL. EX. 1 -- Robert Goggin Depo Tr. 299:24- 300:9.

47.    Luber informed Robert Goggin that Luber would be the manager of JDJSL, and would provide services to Main Street, including providing that Goldner would take care of the operations. EX. 1 -- Robert Goggin Deposition Tr. 250:15 -252:20.

48.    However, as already noted, at no time during that meeting did Luber disclose that Luber would be enjoying 10% of all monies that flowed through JDJSL by virtue of his 10% ownership, over and above any legal fees he charged Main Street for his services – indeed, Goggin thought he was hiring a lawyer, not an independent agent. EX. 1 -- Robert Goggin Depo Tr. 223:4 – 224:2.

49.    Goggin did not know about the 10% ownership interest of Luber until close to JDJSL's termination – thus the instant action. EX. 1 -- Robert Goggin Depo Tr. 287:5 – 287:20.

50.    Before entering into the engagement letter, Robert Goggin asked whether or not Luber's disclosure of potential conflicts constituted a waiver upon Robert Goggin's signing of the engagement letter. EX. 1 -- Robert Goggin Depo Tr. 218:13 – 219:10.

51.     Luber said that it did not because he did not represent Goldner and had not represented him for some time.  EX. 1 -- Robert Goggin Depo Tr. 218:13 – 219:10.

52.     However, tellingly, a side by side comparison of Mr. Luber's draft Consulting Agreement for JDJSL and Main Street (EX. 8 – Reger Rizzo Ex 15), versus for another entity (EX. 9 – Reger Rizzo Ex 9), reveals that Mr. Luber deliberately elided from Exhibit 15 a paragraph (paragraph 15) admonishing parties to obtain separate counsel.  See generally EX. 2 -- Rizzo Depo Tr. 161:12 – 163:15.

53.     Reger Rizzo and Luber knew well how to advise clients as to conflicts when they arose.  *See* EX. 10 -- Reger Rizzo Exhibit 27, in which Luber advises another potential conflict about his ongoing representation of Goldner, even as he disavows his ongoing representation of Main Street.

54.     Reger Rizzo was unaware of any such letter ever being sent to Goggin or to Main Street.  EX. 2 -- Reger Rizzo Depo Tr. 206:15 – 207:1.

55.     When Robert Goggin asked about conflicts in the Consulting Agreement that would provide for Luber and Goldner's services, Luber told him, "I know of no conflicts whatsoever." EX. 1 -- Robert Goggin Depo Tr. 282:18 – 283:19; 285:9-18.

56.     Robert Goggin subsequently testified that it mattered greatly to him that Luber in fact *was* conflicted because of his representation of Goldner.  EX. 1 -- Robert Goggin Depo Tr. 520:14 – 521:3.

57.     Main Street entered the Consulting Agreement based on Luber's deceptions: the purpose of the Consulting Agreement, in Robert Goggin's view, was "the additional oversight of Joel Luber through JDJSL."  EX. 1 -- Robert Goggin Depo Tr. 542:9 – 15.

58.     Sandy Sheehan (now Sandy Andujar) was hired to handle bookkeeping for Main Street.  However, while Sheehan was the bookkeeper, Goldner testified that he instructed Ms. Sheehan daily for *hours* respecting the keeping of those books.  EX. 3 -- Goldner Depo Tr. 238:4 – 241:8.

59.     Specifically, he would go over the books with her "usually about three times a day because it was that fast."  EX. 3 -- Goldner Depo Tr. 240:20-23.

60.     Goldner estimated that he spent "three hours a day," on those tasks.  EX. 3 -- Goldner Depo Tr. 241:2-4.

61.     Indeed, Robert Goggin's understanding was that until he "fired Michael Goldner and JDJSL, Michael Goldner and JDJSL were responsible for the books."  EX. 1 -- Robert Goggin Depo Tr. 354:16-20.

62.     In Robert Goggin's understanding, the Consulting Agreement gave Goldner "complete control over the books and records of the company."  EX. 1 -- Robert Goggin Depo Tr. 560:6-18.

63.     While the funds would eventually end up in the hands of Goldner for his services, they would be controlled by Luber.  EX. 1 -- Robert Goggin Depo Tr. 313:1 – 315:12.

64.     Robert Goggin was not bothered by this, because he all along believed and expected that, among other things, it was Luber's job to tell him if there was an actual conflict and to put that communication in writing. EX. 1 -- Robert Goggin Depo Tr. 315:2 – 315:12.

65.     From the beginning, Luber and Goldner told Robert Goggin that all the money paid to JDJSL would go to Goldner. EX. 1 -- Robert Goggin Depo Tr. 302:7-304:10.

66.     At the time he engaged Luber and Reger Rizzo, and agreed to the structure proposed, recommended, and drafted by Luber, Robert Goggin did not know that Luber had a

financial interest in JDJSL over and above his duties as an attorney to Main Street. EX. 1 -- Robert Goggin Depo Tr. 302:7-304:10.

67.     On May 13, 2014, in setting up the finances for Main Street, Michael Goldner wrote to the bookkeeper, Sandi Sheehan, "Joel will quarterback the team, but you need to reconcile and have the numbers ready for us to review and set up wires and transfers to Joel on our direction." EX. 11 -- Goldner depo Ex. 1.

68.     While Defendant Luber was "quarterbacking," Goldner also testified that Plaintiff Robert Goggin "really didn't have much to do of anything of the day-to-day."  EX. 3 -- Goldner Depo Tr. 129:1 – 10.

69.     Luber understood well his quarterbacking function.  As Luber wrote to Goldner on Wednesday, June 25, 2014, at 11:13 am from his Reger Rizzo account, assuring Goldner that Luber would run things and run them well:

> I knew you were either in a manic mode or inebriated during that tirade; so I restrained myself and didn't answer.  We'll keep this thing running like a top.  A little less micro managing from you, and we will all be good.  I know how to keep score.  And I don't have a problem when the equilibrium goes off kilter from time to time.  Be cool, cousin!

EX. 12 -- Luber Exhibit 14.

70.     However, Luber's quarterbacking included not only involvement in the finances of Main Street, but also making payments to victims of Michael Goldner's Arcadia debacle over a long period of time, often with money funneled from Main Street.   Ex. 3 -- Goldner Depo Tr. 49:15 – 49:24; 67:19 – 68:21.

71.     As Goldner said respecting their joint enterprises, "He [Luber] manages the – the money."  EX. 3 -- Golder Depo Tr. 327:10 -16.; see also EX. 13 -- Goldner Ex. 55 and EX. 3 -- Goldner Depo Tr. 322:6-15.

72.     Luber and Reger Rizzo were paid legal fees in part for such quarterbacking efforts. EX. 14 -- Goldner Depo. Ex. 2.

73.     Such legal fees were at times paid from Main Street to JDJSL, and then from JDJSL to Reger Rizzo.  EX. 3 -- Goldner depo Tr. 69:3 – 22; EX. 15 -- Goldner Depo Ex. 7.

74.     Sometimes Goldner and Luber would skip the step, and money would go directly from Main Street to some other recipient.  EX. 3 -- See Goldner Depo Tr. 419:8-13.

75.     Among other items, Luber's job was to send disbursements of money that Main Street passed to JDJSL out of JDJSL.  EX. 3 -- Golder Depo Tr. 52:13 – 16.

76.     For instance, among many examples, shortly after setting up accounts with Main Street, Luber was charged by Michael with transferring $30,000 from JDJSL to various creditors, including two parties impacted by the Arcadia fall out, and he went to the Bank on Michael's behalf. EX. 3 --  Goldner Depo. Tr. 54:15 – 57:19; EX. 16 -- Goldner Depo. Ex. 3; EX. 17 -- Goldner Depo Ex. 4.

77.     Shortly thereafter, Michael Goldner funded a trust with a payment from MSBF that Luber was to reimburse to MSBF, though it remains unclear if Luber ever did.  EX. 18 -- Goldner Depo. Ex. 5.

78.     Soon thereafter, Luber was charged with reimbursing Main Street for monies extracted by Goldner, but reported that he was told by Goldner to "ignore this one."  EX. 19 -- Goldner Depo. Ex. 6.

79.     Luber facilitated additional transfers in the weeks, months and year to come.  See several examples at EX. 20 -- Goldner Depo. Ex. 7; EX. 21 -- Goldner Depo. Ex. 8; EX. 22 -- Goldner Depo. Ex. 11; EX. 23 -- Reger Rizzo Ex. 24; EX. 24 -- Luber Ex. 30; EX. 25 -- Luber Exhibit 34; EX. 26 -- Goldner Depo Ex. 57; EX. 27 -- Goldner Depo Ex. 59; EX. 28 -- Goldner

Depo Ex. 61; EX. 29 -- Goldner Ex. 62; EX. 30 -- Goldner Ex. 63; EX. 31 -- Goldner Ex. 64; EX. 32 -- Goldner Ex. 65; EX. 33 -- Goldner Ex. 67; EX. 34 -- Goldner Ex. 68; EX. 35 -- Goldner Ex. 69; EX. 36 -- Goldner Ex. 70; EX. 37 -- Goldner Ex. 71; EX. 38 -- Goldner Ex. 72; EX. 39 -- Goldner Ex. 73; EX. 40 -- Goldner Ex. 74; EX. 41 -- Goldner Ex. 77; EX. 42 -- Goldner Ex. 79; EX. 43 -- Goldner Ex. 81.

80. Luber was frequently in contact with Sandi Sheehan, bookkeeper for Main Street, about such extraneous payments.  EX. 44 -- Goldner Depo Ex. 56.

81. He also required MSBF to pay Goldner's JDJSL credit card directly.  EX. 45 -- Goldner depo. Ex. 9.

82. Luber also required Sandi Sheehan and Goldner's involvement in transfers of money from Main Street for payment on a car lease for a maroon Infiniti that Luber had set up for himself through JDJSL.  EX. 46 -- Goldner Depo Ex. 107; EX. 3 -- Goldner Depo Tr. 557:10 – 559:9; see also EX. 3 -- Goldner Depo Tr. 394:16- 22; 396:5-10; EX. 47 -- Goldner Depo Ex. 66.

83. A year later, on July 17, 2015, Goldner's instruction to Luber remained in essence what it had been a year earlier: "Just run the show."  EX. 48 -- Goldner Depo. Ex. 33.

84. Soon after beginning his role at Main Street, and over the ensuing year, Michael Goldner extracted significant sums of money from Main Street.  EX. 3 -- Goldner Depo Tr. 121:9 – 15.

85. Years before, Goldner had been involved in the running of an investment fund called Arcadia, and now his practices in connection with that fund were catching up with him.  At the time Goldner signed on with Main Street, Robert Goggin was informed of civil suits (EX. 1 -- Robert Goggin Depo Tr. 206:22-207:7).

86.     But it transpired in the coming year that Goldner's exposure was much, much more serious than mere civil matters.  Indeed, in connection with the operation of Arcadia, Goldner eventually pleaded guilty to and was convicted of one count of wire fraud and one count of tax evasion.  EX. 3 -- Goldner Depo Tr. 12:22 – 13:2.

87.     Prior to sentencing, Goldner produced a "friend or foe" list and list of "fraud amount" showing Arcadia victims, amounts owed, and whether they were disposed to aid him in sentencing,  EX. 49 -50 -- Goldner Depo Exs. 13, and 14.

88.     Goldner made compensation to such victims in advance of his sentencing.  EX. 3 -- Goldner Depo Tr. 90: 4 – 96:23.

89.     Such payments were with an eye to currying their favor in advance of sentencing.  Luber helped him to facilitate payments.  EX. 3 -- Goldner Depo. Tr. 96:24 – 97:3.

90.     Luber also helped him to track such payments.  EX. 51 -- Goldner Depo. Ex. 78; EX. 3 -- Goldner Depo Tr. 434:3 – 20.

91.     Payments were made from funds that were directly or indirectly derived from Main Street.  EX. 3 -- Goldner Depo. Tr. 99:22 – 100:1; EX. 52 -- Goldner Depo. Ex. 15; EX. 3 -- Goldner Depo. Tr. 100:6 – 101:3.

92.     At least once, Goldner caused Main Street to obtain loans in order to make the payments to Arcadia victims on Goldner's behalf.  EX. 3 -- Goldner Depo Tr. 105:4 – 106:1; EX. 94 -- Goldner Depo. Ex. 17.

93.     Goldner also caused Main Street to pay back loans made to him by a personal friend while they were gambling at the Atlantic City Borgata.  EX. 3 -- Goldner Depo. Tr. 108:14 – 109:9; EX. 3 -- Goldner 267:10 – 268:8; EX. 53 -- Goldner Depo Ex. 45.

94.     He repeatedly caused personal loans to be paid directly from Main Street. EX. 3 --
Goldner Depo Tr. 933:22 – 935:11; EX. 54 -- Goldner Ex. 117.  He did so without approval from
Robert Goggin.  EX. 3 -- Goldner Depo Tr. 971:3 – 972:23.)

95.     Mr. Goldner himself estimated that in his time with Main Street, which ran for
something over a year, he took out $4 million in compensation.  EX. 3 -- Goldner Depo Tr. 121:9
– 15.  The number may well be greater.  EX. 55 – Supplemental Expert Report by Stephen J.
Scherf.

96.     This compensation was extracted notwithstanding that by early 2016, just before
his termination, by Goldner's own estimates only $6 -$7 million of money was deployed (EX. 3 -
- Goldner Depo Tr. 516:20 – 517:6) and Main Street was in the market for bridge loans (EX. 56 -
- Goldner Ex. 92).

97.     This money was also extracted notwithstanding representations made by him with
the aid of Joel Luber in an insurance application that Goldner's annual salary was at best only
around $500,000 around 2015.  (EX. 57 -- Goldner Depo Ex. 95; EX. 3 -- Goldner Depo Tr.,
529:11 – 530:11; 532:1-3.).

98.     Furthermore, Goldner's estimation of the $4 million he extracted is blatantly at odds
with the amounts he claimed to have earned for 2015, a month or so before his termination: "I
would say north of a million each."  EX. 3 -- Goldner Depo Tr. 955:24-956:2.

99.     This money was also extracted notwithstanding the fact that of the thirty investors
in Main Street, by the time of Mr. Goldner's departure, only four notes belonging to those thirty
investors had been redeemed.  EX. 3 -- Goldner Depo Tr. 928:16-21; 931:23 – 933:21.

100.     Robert Goggin was apprised of the purported good health of Main Street by Goldner weekly when Goldner would weekly present him with a handwritten spreadsheet made by Goldner himself.  EX. 3 -- Goldner Depo Tr. 936:11 – 939:7.

101.     Robert Goggin now believes that these numbers were a sham.  EX. 1 -- Robert Goggin Depo Tr. 366:9-367:5; 365:19 – 25.


102.     Ultimately, the money Goldner extracted from Main Street did appear to accomplish Mr. Goldner's core aim.  In connection with his guilty pleas in the Arcadia matter, he was sentenced thereafter by J. Gerald McHugh to probation, a year of community confinement, and restitution.  EX. 3 -- Goldner Depo Tr. 13:3 – 19; EX. 58 -- Goldner Ex. 97; EX. 59 -- Goldner Ex. 98.

103.     After living at 1102 Rosewood Lane, Glen Mills, PA for ten years, Goldner and his family were in the process being evicted from that property for non-payment of mortgage and taxes stretching back for six years.  EX. 3 -- Goldner Depo Tr. 422:14 – 423:21; EX. 60 -- Goldner Depo Ex. 75; EX. 3 -- Goldner Depo Tr. 424:22 – 425:1.

104.     Accordingly, sometime in the spring or early summer of 2015, Goldner sought to purchase a $1.8 million property located at 7 Dovecote Lane, Malvern, Pennsylvania, 19355 (the "Malvern Property").  See EX. 61 -- Goldner Depo Ex. 24.

105.     To purchase the property, Goldner would need a loan for almost the entirety of the purchase price, but a problem developed:  Goldner's attempt to finance 90% of the price of the house fell through.  EX. 3 -- Goldner Depo Tr. 189:11 – 191:23.

106.     Thereafter, Luber scrambled to help Goldner obtain financing for roughly half the house, or about $1.001 million, from National Capital Management ("NCM").  EX. 62 -- Reger Rizzo Exhibit 25; EX. 4 -- Luber Depo Tr. 54:5 - 10.

107.     Luber raised a concern to Goldner that a failure to purchase the house would forfeit a $91,000 deposit.  (See EX. 63 -- Goldner Ex. 29).

108.     However, even with the partial financing, there was close to a million dollar shortfall.  As Luber suggestively wrote to Goldner, "I trust you got an extra one million laying around."  EX. 64 -- Luber Ex. 6.

109.     At or about the time Goldner decided to purchase the Malvern Property for himself, Goldner approached Robert Goggin and asked to borrow $150,000 for closing money on the property (EX. 1 -- Robert Goggin Depo Tr. 578:11-579:3).

110.     It was understood at Main Street that the loan was only for $150,000.  EX. 5 -- Tara Merlino Deposition 114:10-23 ("he [Goldner] told us that Bob lent him 150,000.")

111.     The remainder, some $700,000, Goldner took directly from Main Street.  <u>Goldner himself was clear that Robert Goggin did not approve of the transfers of money out of Main Street to pay for the Malvern property, and that Goldner himself had not told him about the extraction of some additional $700,000 from Main Street.</u>  EX. 3 -- Goldner Depo Tr. 160:11 – 164:3.

102.     Because Main Street did not actually have the money sitting around, Goldner also caused Main Street to borrow $700,000 from Par Funding ("Par Loan") at an incredibly high interest rate (roughly $200,000 in interest over a six month period). EX. 3 -- See Goldner Depo Tr. 205:1 – 23; EX. 65 -- Goldner Ex. 30; EX. 3 -- Goldner Depo Tr. 210:8 – 212:11.

103.     The Par Loan was broken up so that it did not appear as a single $700,000 loan. EX. 3 -- Goldner Depo Tr. 228:24 – 229:18.

104.    Goldner did not inform Robert Goggin of the existence or purpose of the Par Loan, nor did he receive permission from Robert Goggin or Main Street to take out the Par Loan.  EX. 3 -- Goldner Depo Tr. 160:11 – 164:3.

105.    Sensitive to the issue, and despite the fact that Luber ran all of Goldner's finances, Luber claimed at deposition to having been ignorant at the time of the source of the additional $820,000 in funding.  EX. 4 -- Luber Depo Tr. 54:15 – 55:8.

106.    However, at deposition Luber was impeached on this point, and confronted with correspondence among Goldner and Sheehan at Main Street the day before closing (EX. 4 -- Luber Depo Tr. 117:6 – 118:15; EX. 66 -- Luber Ex. 7), and was forced to admit that he knew "on or soon after closing" that the $820,000 shortfall was being taken from Main Street (EX. 4 -- Luber Depo Tr. 127:7-20.).

107.    Goldner also had Luber coordinate with Sandi Sheehan how to pay the mortgage on NCM out of funds from Main Street.  EX. 67 -- Goldner Ex. 76.

108.    As Goldner makes clear, he never made the mortgage payments himself: all the payments and financing on the house were handled by Joel Luber (using Main Street's money). EX. 3 -- Goldner Depo Tr. 449:19 – 451:4.

109.    Michael Goldner himself did not own the property technically: instead they leased it from Dovecote (which Joel Luber managed) for a fee of *zero dollars*.  EX. 3 -- Goldner Depo Tr. 503:8-504:1; EX. 68 -- Goldner Ex. 90.

110.    Luber did not inform Robert Goggin or Main Street of the repeated draining of Main Street for the purposes of making payments to the Arcadia victims in advance of sentencing. EX. 1 -- Robert Goggin Depo Tr. 358:13 – 359:7.

111.    Similarly, Luber failed to inform Robert Goggin that Goldner had taken money from Main Street in connection with the Malvern Property for his personal benefit.  EX. 4 -- Luber Depo Tr. 130:22- 131:4.

112.    Luber signed an affidavit on behalf of Dovecote in connection with the closing of the Malvern Property in which he attested that no money was borrowed for the house from any source other than NCM.  See attached Reger Rizzo Exhibit 28.

113.    Luber at this time was the manager of JDJSL (EX. 3 -- Goldner Depo 283:1 – 9) with a 10% interest in all monies that flowed through JDJSL from Main Street (EX. 3 -- Golder Depo Tr. 281:14 – 282:24; EX. 69 -- Goldner Exhibit 52).

114.    Luber and Reger Rizzo were *also* attorneys for JDJSL handling "general corporate" matters between February 2014 and at least February 2016 (EX. 70 -- Reger Rizzo Ex. 1; EX. 2 -- Reger Rizzo Depo Tr. 37:6 – 37:24; see, generally, EX. 2 -- Reger Rizzo Depo. Tr. 84:17 – 94:21).

115.    Luber and Reger Rizzo were *also* corporate counsel for Main Street (the entity obligating itself on the Par Loan and lending to Dovecote, and the entity from which JDJSL was funneling money) handling "general corporate" matters from February 2014 to at least January 2016 (EX. 2 -- Reger Rizzo Depo Tr. 37:19-21; EX. 71 -- Reger Rizzo Exhibit 3; see generally EX. 2 -- Reger Rizzo Depo Tr. 95:20 – 99:2; EX. 72 -- Reger Rizzo Exhibit 22).

116.    Luber and Reger Rizzo were *also* counsel for plaintiff Robert Goggin from early 2014 through at least January 2016  (EX. 2 -- Reger Rizzo Depo Tr. 100:5 – 101:17; EX. 73 -- Reger Rizzo Ex. 4; EX. 74 -- Reger Rizzo Exhibit 22; EX. 75 -- Luber 27).

117.    Luber was *also* the manager of and attorney for Dovecote (the entity receiving the proceeds of the Main Street loan) (see EX-- 76-77-- Goldner Depo Exs. 24+25; EX. 78 -- Reger Rizzo Exhibit 26; EX. 3 -- Goldner Depo Tr. 498:10-12).

118.    Luber was *also* the trustee of and, through Reger Rizzo, attorney for Mr. Goldner's trust (EX. 3 -- Goldner Depo 283:1-9; EX. 79 -- Reger Rizzo Exhibit 24 at page 349; EX. 80 -- Reger Rizzo Exhibit 26; EX. 81 -- Reger Rizzo Exhibit 31).

119.    Luber was *also* the trust protector for the Robert Goggin Family Trust (which entity owned Main Street) (see EX. 2 -- Reger Rizzo Depo Tr. 37:6 – 24).

120.    Furthermore, according to Goldner, Luber and Reger Rizzo were *also* Goldner's attorney respecting the purchase of the Malvern property,  EX. 3 -- Goldner Depo Tr. 157:4-7. (See also EX. 2 -- Reger Rizzo Depo Tr. 37:6 – 24; EX. 82 -- Reger Rizzo Exhibit 26), and in fact Luber and Reger Rizzo *also* represented Goldner at the very least from mid-2014 through 2016 (EX. 2 -- Reger Rizzo Depo Tr. 102:6 – 103:15; EX. 83 -- Reger Rizzo Ex. 5).

121.    Reger Rizzo remained involved.  The closing on the Malvern Property was at Reger Rizzo.  EX. 3 -- Goldner Depo. Tr. 228:3 – 6; EX. 84 -- Goldner Depo Ex. 35.

122.    For the purposes of this litigation, at deposition Luber initially claimed that somehow he was not a corporate counsel for Main Street, and that all such duties ceased when the Consulting Agreement was signed because otherwise there would have been a conflict.  EX. 4 -- Luber Depo Tr. 58:6 – 59:8.

123.    However, when at deposition he was subsequently impeached with Reger Rizzo paperwork demonstrating that he had billed Main Street for several tasks in connection with his general corporate representation of same, including for time entries in February 2015, April 2015, and again in June 2015, just before the closing on the Malvern Property, he was forced to

backpedal, finally explaining that the work he had billed for had been, alternatively, a "courtesy" or "spot assignment" or "input into the wrong file." See EX. 85 -- Luber Depo Ex. 3 and lengthy colloquy at EX. 4 -- Luber Depo Tr. 91:8 – 109:21.

124.    Reger Rizzo did not stop Luber at any point from engaging in these conflicting representations – rather, Luber himself always ran his conflict checks so as to elide the existence of the rampant conflicts.  (EX. 2 -- Reger Rizzo Depo Tr. 37:6 – 24; see Reger Rizzo Depo Exhibits 1-5; broadly, see EX. 2 -- Reger Rizzo Depo. Tr. 37:6 – 49:9)

125.    Sometime in either late December of 2015 or January of 2016, Robert Goggin learned, through Attorney Eugene Tinari (Goldner's criminal defense counsel), that Luber was a 10% owner of JDJSL.  EX. 1 -- Robert Goggin Depo Tr. 302:7-304:10.

126.    Because Robert Goggin all along believed that Luber was his counsel and counsel for Main Street, Robert Goggin was shocked. EX. 1 -- Robert Goggin Depo Tr. 302:7-304:10.

127.    Goldner confirmed this arrangement at deposition, that Luber was entitled to (and demanded) 10% of monies earned by JDJSL.  EX. 3 -- Golder Depo Tr. 281:14 – 282:24; EX. 86 -- Goldner Exhibit 52; EX. 87.

128.    According to Robert Goggin, had he known of Luber's interest in JDJSL, Robert Goggin would not have hired Luber as either his attorney or Main Street's attorney, would not have had Luber or Reger Rizzo as corporate counsel for Main Street before entering into the Consulting Agreement, and would not have entered into the Consulting Agreement.  EX. 1 -- Robert Goggin Depo Tr. 316:7 – 318:20.

129.    On or around the time just prior to Goldner's January 28, 2016 sentencing hearing, Luber prepared a demand note for $916,000, which was dated July 21, 2015, and presented it to Robert Goggin (the "Demand Note"). EX. 1 -- Robert Goggin Depo Tr. 586:8 – 587:11.

130.    As opined by Plaintiffs' expert, the Demand Note did not contain within it the protections obligees generally require of obligors in these types of transactions, including the types of security, personal guarantees, and remedies that a sophisticated private lender would require. In short, it favored Luber and Reger Rizzo's *other* clients – not Main Street.  The maker on the Demand Note was Dovecote, which was acquiring the Malvern Property, and was signed by Luber himself as manager of Dovecote. To make matters worse for Main Street, the Demand Note was subject to a first mortgage/lien held by National Capital Management, L.P. in the principal amount of $1,001,000. Along with the Demand Note, Luber provided two letters on JDJSL letterhead, both of which were dated August 3, 2015 and signed by Luber.  (SEE EX. 91 – Amended Expert Report of Gilbert Abramson, page 7, bottom paragraph).

131.    That afternoon, at Butcher and Singer, Robert Goggin confronted Luber, stating that he had never authorized the Dovecote loan.  EX. 1 -- Robert Goggin Depo. Tr. 587:13 – 588:7.

132.    Luber pleaded with Robert Goggin, saying, "look, it's very important that we keep Michael out of jail.  If we keep him out of jail, then all of this will be able to go away."  Robert Goggin pressed him, stating, "I said this isn't the only thing that was going on." In response, Luber said, "a lot of things went on all for the purpose of keeping Michael out of jail.  He's making a lot of money for Main Street, you need him out.  It's important for me to keep him out.  And all of this – if he stays out of jail, all of this will be fine.  We'll make it good."  EX. 1 -- Robert Goggin Depo. Tr. 587:13 – 588:7.

133.    Shortly thereafter, on February 26, 2016, Luber stated, in an email to Goldner, that "some very significant conflict issues . . . just kicked in." (EX. 92 – Reger Rizzo Ex. 8).

134.     When Reger Rizzo was asked about the conflicts among Main Street and JDJSL, the representative stated, "I would have to defer to Joel on that issue."  EX. 2 -- Reger Rizzo Depo Tr. 107:2 – 12.

135.     Upon closer examination of the books over many months thereafter, Robert Goggin ultimately determined that Main Street's money had been looted, and that Luber had either facilitated it, let it happen or in some cases, both.  EX. 1 -- Robert Goggin Depo Tr. 307:19 – 308:19.

136.     Robert Goggin confirmed that "Michael Goldner and JDJSL were responsible for the books" (EX. 1 -- Robert Goggin Depo Tr. 354:16-20), and that "Michael Goldner and JDJSL manipulated these ledgers to hide funds that they were stealing.  EX. 1 -- Robert Goggin Depo Tr. 355:8 -17.

137.     Robert Goggin's review of the books, with the aid of experts, demonstrated several unauthorized transactions, including "payments to his [Goldner's] victims in his prior criminal activity."  EX. 1 -- Robert Goggin Depo Tr. 358:13 – 359:7.

138.     Robert Goggin's general criteria for determining what were unauthorized transactions was "For the most part, they weren't a company we were advancing money to."  EX. 1 -- Robert Goggin Depo Tr. 361:2 – 6.

139.     Robert Goggin explained that while JDJSL and Goldner were operating Main Street, he "would rely upon Michael Goldner.  I would rely upon Jonathan Goldner.  I would rely upon JDJSL.  I would rely upon Joel Luber," but the detection of the fraud had forced him to revisit all transactions.  EX .1 -- Robert Goggin Depo Tr. 363:4 – 15.

140.     Robert Goggin noted that it was "required that Mr. Goldner receive authority from you [Robert Goggin] to make a transaction involving a transfer or payment to someone or some

entity other than himself for money that was due him" but that neither Goldner nor JDJSL had ever obtained his permission for the many such transfers that were made.  EX. 1 -- Robert Goggin Depo Tr. 365:6-11.

141.    Furthermore, Robert Goggin has now developed an understanding that "never did this company operate with a profit" (EX. 1 -- Robert Goggin Depo Tr. 366:9-367:5), and thus "every time it [amounts] were paid to JDJSL it was an inaccurate amount" "because they were supposed to split the profits and there were no profits."  EX. 1 -- Robert Goggin Depo Tr. 365:19 – 25.

Respectfully submitted,

Dated: September 13, 2019                      KUTAK ROCK LLP

By:      */s/ Peter N. Kessler*
         Oliver D. Griffin, Esquire
         Peter N. Kessler, Esquire
         1760 Market Street   Suite 1100
         Philadelphia, PA 19103
         (215) 299-4384
         Oliver.Griffin@KutakRock.com
         Peter.Kessler@KutakRock.com